-IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NICOLE BALLARD,<br>        **Plaintiff,**<br><br>    **v.**<br><br>**MERCY CATHOLIC MEDICAL<br>CENTER OF SOUTHEASTERN<br>PENNSYLVANIA  d/b/a MERCY<br>HOSPITAL,**<br>        **Defendant.** | **CIVIL ACTION NO. 12-0779** |

**Baylson, J.**                                                                    **June 28, 2013**

### MEMORANDUM RE: MOTION FOR SUMMARY JUDGMENT

**I.      Introduction**

Plaintiff Nicole Ballard ("Ballard") filed a Complaint against her former employer,

Mercy Catholic Medical Center ("Mercy"), alleging she was subjected to racial discrimination, a

racially hostile work environment, and to retaliation, all in violation of 42 U.S.C. § 1981.  (ECF

1).  Currently before the Court is Defendant's Motion for Summary Judgment (ECF 22),

Plaintiff's Response (ECF 23), and Defendant's Reply (ECF 24).  For the reasons below, the

Court will GRANT Defendant's Motion.

**II.      Facts and Procedural History**

The parties' Statements of Undisputed Facts show that many operative facts are not in

dispute.  Where there are facts in dispute, the Court notes such below.  The Court considers the

facts in the light most favorable to the non-moving party, i.e., Plaintiff.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 255 (1986).

1

Plaintiff is an African-American female who was employed as a registered nurse at Mercy Catholic Medical Center between March 2008 and November 2010. She was terminated on November 10, 2010. She typically worked three weekday shifts each week, and she occasionally worked weekend shifts as well. (Pl. Statement of Facts ¶¶ 3-4) (ECF 23).

In the fourteen-month period between February 2009 and March 2010, Plaintiff received multiple "Colleague Counseling Reports" from Mercy for absenteeism and lateness. (Def. Exs. T, U, V, W & X). She also received a Counseling Report in April 2009 for failing to "follow proper procedure" when labeling a blood specimen. (Def. Ex. Y). In a Performance Evaluation issued July 19, 2010, Ballard's supervisors concluded: "Nicole has the ability to be a good nurse. She doesn't work at her fullest potential most of the time. She need[s] to improve on her attendance and lateness. I would like to see her less argumentative." (Def. Ex. Z).

Plaintiff contends her absenteeism and lateness between the spring of 2009 and the spring of 2010 was due to her children's school schedules – she is a mother of five – and that in March 2010, she arranged for additional childcare. (Pl. Statement of Facts ¶¶ 6-7). Following this arrangement, Plaintiff notes she did not receive any more write-ups related to lateness. (Id. ¶ 10).

On November 7, 2010, a Sunday, Plaintiff was scheduled to work at Mercy. When she arrived, no assignments had been designated on the white board of the Emergency Room. (Id. ¶ 21). Plaintiff wrote her name on the white board next to her desired assignment – triage – but learned shortly thereafter that Carly Cruz, the charge nurse, had called to relay assignments via telephone to nurse Tia. (Id. ¶¶ 22-23). Tia informed Plaintiff she had been assigned by Cruz to staff specific rooms in the emergency department. (Id. ¶ 24). According to Plaintiff, she was already working in triage at this point, and told Tia she wished to stay there. (Id. ¶ 25). Defendant claims Plaintiff's response was that she "wanted to go out to triage" and did not want

to work in the back with "y'all bitches."  (Def. Reply to Pl. Statement of Facts ¶ 25) (ECF 24). The parties agree that Plaintiff remained in the triage unit.

Later that morning, Plaintiff received permission to leave work early from Supervisor Larry Williams because she was not feeling well. (Pl. Statement of Facts ¶¶ 31-32). Plaintiff informed Annette Nixon, a fellow nurse, that she was leaving early and that Nixon could "go out to triage." (Ballard Dep., Def. Ex. C at 178).  At the time she spoke with Nixon, there were no patients in triage. (Pl. Statement of Facts ¶ 35).  Also before Plaintiff departed, she was approached by Anne Schotmiller, a fellow nurse, and was told she wrongfully placed a patient in a room without informing Schotmiller. (Id. ¶ 36).  Plaintiff responded that she had reported the placement "to someone, maybe Carly [Cruz]." (Ballard Dep., Def. Ex. C at 268). Plaintiff then clocked out for the day and went to the cafeteria.

While waiting in line at the cafeteria, Carly Cruz, the charge nurse, approached Plaintiff from behind and whispered, "I'm going to tell Carmen what you did, you lying n_ _ _ _ _." (Ballard Dep., Def. Ex. C at 181-82).  Carmen Williams was the nurse manager at Mercy's emergency department. (Id. at 44). Plaintiff turned around and said "you better watch who you're talking to like that" (Ballard Dep., Pl. Ex. A at 186), and "you better not say that out your mouth again because you'll get punched in it."  (Ballard Dep., Def. Ex. C at 193-94). Plaintiff told Cruz she was going to "bust her in the lip." (Id. at 193-94). Cruz responded by asking "you threatening me[?]," and said she was going to call 9-1-1. (Id.).  Plaintiff told Cruz to "take it for what she want[s]," (Id. at 193). Plaintiff paid for her food and went home. (Pl. Statement of Facts ¶ 43).

That same day, Cruz called 9-11 and notified hospital security of Plaintiff's threat. (Pl. Ex. L).  A "Security Department Incident Report" was created based on Cruz's complaint. (Def. Ex. EE). Cruz attempted to reach Carmen Williams, and Williams was informed of the

altercation later that evening. (Id.; see also Williams Dep., Def. Ex L at 29-30 (stating that on the evening of November 7th, "someone called me to let me know the incident")).

When Williams arrived for work on November 8th, she commenced an investigation into the cafeteria incident between Plaintiff and Cruz. She spoke with hospital staff and gathered written statements. (Pl. Statement of Facts ¶¶ 46, 48). Barbara Woodlock, a cafeteria worker, related that Plaintiff had been in the cafeteria when "a young lady came in [and] said something to Nicole[,] and all hell broke loose." (Pl. Ex. K). Neither Woodlock nor any other individual, however, overheard the specific remarks of Plaintiff or Cruz. (Pl. Statement of Facts ¶ 52). Nurses Nixon, Cruz, and Therese DiGuardi submitted written statements to Williams on November 9th. (Def. Exs. AA, CC & DD). All three women reported that Plaintiff had unilaterally assigned herself to triage on November 7th (Pl. Statement of Facts ¶¶ 56-58; Def. Exs. AA, CC & DD), and Cruz additionally reported that Plaintiff had walked patients into emergency rooms without notifying anyone, left the triage area unattended, and referred to her coworkers as "bitches." (Pl. Statement of Facts ¶ 57).

At some point in the morning of November 8th before lunch, as her investigation was underway, Williams spoke with Laura Clift. The two decided that Plaintiff should be suspended pursuant to a hospital policy requiring that any employee alleged to have made a physical threat be suspended pending an investigation. (Pl. Statement of Facts ¶67; Williams Dep., Def. Ex L at 42-44; Clift Dep., Def. Ex. HH at 26-28).

Meanwhile, when Plaintiff arrived for work on November 8th, she submitted an entry into the hospital's incident reporting system, known as the "MIDAS" system. (Id. ¶ 59). The entry bore a time stamp of 8:18 A.M. and it stated that on November 7th, Plaintiff "was approached by" Cruz and "called a derogatory name." (Pl. Ex. J). Shortly thereafter, Plaintiff

met with Williams to talk about the events that had transpired in the emergency department on the prior day. (Ballard Dep., Def. Ex. C at 234-35).  During this meeting, Plaintiff did not report Cruz's use of a racial slur. (Id.).

Plaintiff returned to her work station and subsequently received a phone call from Williams, telling her to report to the Human Resources office. (Pl. Statement of Facts ¶¶ 62-63; Ballard Dep., Def. Ex. C at 235; Williams Dep., Def. Ex L at 43).  Plaintiff brought her belongings with her to HR, because she thought she would be told to leave for the day. (Ballard Dep., Def. Ex. C at 236). Plaintiff met with Williams and Clift, and was informed that there was going to be an investigation into the cafeteria altercation. (Id. at 236-37). At this point, Plaintiff reported that Cruz had referred to her as a "lying n_ _ _ _ _" in the cafeteria, thus provoking Plaintiff's threat. (Id. at 237). Plaintiff submitted a written statement, signed at 10:25 a.m. on November 8th, memorializing her allegation of the racial slur. (Def. Ex. BB).  Plaintiff went home and received a phone call from Laura Clift later that day, informing her that she was being suspended. (Ballard Dep., Def. Ex. C at 239).  Her suspension notice stated: "You are suspended from work pending investigation of confrontation on the above date [of November 7, 2010]." (Def. Ex. JJ).

As to Carly Cruz, Williams informed her that she would be removed from the schedule – and should not report to work – during the investigation. (Williams Dep., Def. Ex. L at 38-39).

Plaintiff was terminated on November 10, 2010.  At a meeting with Williams and Cruz, she was given a copy of the hospital's "Colleague Responsibility Policy" and told she was being fired for violating it in several ways. (Ballard Dep., Def. Ex. C at 242-44).  Plaintiff could not recall the specifics of the discussion about her termination, but she remembered that her use of profanity as well as "things that had occurred prior to the whole incident" in the cafeteria were

part of the conversation. (Id. at 244-47). Plaintiff's termination notice stated the basis for her termination was her violation of the Colleague Responsibility Policy. (Def. Ex. QQ).

On December 8, 2010, Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC"), asserting unlawful discrimination on the basis of race, racial harassment and retaliation, against Mercy. (Pl. Response in Opp. Summary Judgment at 3) (ECF 23). On February 14, 2012, she initiated suit in this Court, alleging Mercy violated her rights under 42 U.S.C. § 1981 through racial discrimination, submitting her to a hostile work environment, and unlawful retaliation. (ECF 1). Defendant moved to dismiss under Fed. R. Civ. P. 12(b)(6) based on Plaintiff's failure to state a claim (ECF 6), and this Court denied the motion (ECF 9). Following discovery, Defendant moved for summary judgment (ECF 22). Plaintiff responded in opposition (ECF 23) and Defendant replied (ECF 24). The Court held oral argument on June 27, 2013.

### III. Standard of Review

A district court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson 477 U.S. at 248. A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id. Under Rule 56, the Court must view the facts and all reasonable inferences in the light most favorable to the non-moving party. Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)).

Plaintiff alleges she was subjected to racial discrimination, a racially hostile work environment, and retaliation, in violation of 42 U.S.C. § 1981. Section 1981 guarantees all

persons equal rights under the law to "make and enforce contracts." 42 U.S.C. § 1981(b). In the Third Circuit, employment discrimination claims brought under Section 1981 are analyzed pursuant to the burden-shifting framework set forth by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), for adjudicating claims brought under Title VII. <u>See</u> <u>Estate of Olivia ex rel. McHugh v. New Jersey</u>, 604 F.3d 788, 798 n.14 (3d Cir. 2010) (holding "the same standard applies in section 1981 retaliation cases" as in Title VII cases); <u>Ocasio v. Lehigh Valley Family Health Ctr.</u>, 92 Fed. App'x 876, 879 & n.3 (3d Cir. 2004) (holding hostile work environment claims under Section 1981 are analyzed using the burden-shifting framework for Title VII claims).

<u>McDonnell-Douglas</u> places the initial burden of production on the plaintiff to demonstrate a prima facie case of discriminatory conduct. For a wrongful termination claim – alleging one was fired because of her race – the plaintiff's prima facie case involves a showing that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she was terminated; and (4) similarly situated individuals not in the protected class received more favorable treatment, or the circumstances of the termination otherwise give rise to an inference of discriminatory treatment. <u>McDonnell-Douglas Corp.</u>, 411 U.S. at 802; <u>Goosby v. Johnson & Johnson Medical, Inc.</u>, 228 F.3d 313, 318-19 (3d Cir. 2000); <u>Philpot v. Amtrak</u>, 2011 WL 5339030, at *5 (E.D. Pa. Nov. 3, 2011) (Baylson, J.). For a hostile work environment claim, the plaintiff's prima facie case requires a showing of different factors – namely that: "(1) [the plaintiff] suffered intentional discrimination because of race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability." <u>Aman v. Cort Furniture Rental Corp.</u>, 85

F.3d 1074, 1081 (3d Cir. 1996). Finally, for a retaliation claim, the plaintiff's prima facie requires a demonstration that: (1) she engaged in a protected activity; (2) her employer took an adverse employment action against her; and (3) the adverse action was causally related to the protected activity. Moore v. City of Phila, 461 F.3d 331, 340-41 (3d Cir. 2006). For the third prong of the retaliation test, the key inquiry "is whether the alleged retaliation 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Estate of Olivia, 604 F.3d at 798 (citation omitted).

If the employee is able to make out a prima facie case of discrimination, the burden of production then shifts to the employer to advance a legitimate, non-discriminatory reason for its conduct. Estate of Olivia, 604 F.3d at 798. Once the employer articulates such a reason, the burden shifts back to the plaintiff to demonstrate the employer's proffered justification is pretextual. Id. To adduce evidence of pretext sufficient for overcoming a motion for summary judgment, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir.1994); see also Perkins v. Shinseki, 2012 WL 2500325, at *4 (E.D. Pa. June 29, 2012) (Baylson, J.).

## IV. Analysis

Upon review of the record, the Court concludes Plaintiff's evidence fails to establish a genuine dispute of material fact as to any of her three claims. For her charges of racial discrimination and hostile work environment, she has not put forth sufficient evidence to make out a prima facie case. For her charge of retaliation, she has succeeded in demonstrating a prima

facie case but has not submitted evidence that would permit a reasonable jury to find pretext. Accordingly, summary judgment for Mercy is warranted on all three claims.

## A. Racial Discrimination Claim

To make out a prima facie case of racial discrimination under Section 1981, a plaintiff must show she is a member of a protected class, is qualified for the position at issue, suffered an adverse employment action, and was treated differently from similarly situated individuals at the workplace who fell outside of the protected class. Goosby, 228 F.3d at 318-319; Philpot, 2011 WL 5339030, at *5. Defendant concedes for the purpose of summary judgment that Plaintiff has satisfied the first three prongs of the test, but it contends she cannot succeed on the fourth prong. Specifically, Defendant argues that Plaintiff's evidence reveals no similarly situated individual at Mercy who fell outside of the protected class but was treated more favorably.

The Court agrees that Plaintiff has not identified any co-worker who was "similarly situated" but received more beneficial treatment. To be "similarly situated" for the purposes of a workplace discrimination case, "comparator employees 'must be similarly situated in all relevant respects.'" Philpot, 2011 WL 5339030, at *6 (citing Wilcher v. Postmaster Gen., 441 Fed. App'x 879, 882 (3d Cir. 2011)). As the Third Circuit has established, "[a] determination of whether employees are similarly situated takes into account factors such as the employee's job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in." Wilcher, 441 Fed. App'x at 882. If two employees "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish . . . the employer's treatment of them," they will be deemed "similarly situated." McCullers v. Napolitano, 427 Fed. App'x 190, 195 (3d Cir. 2011). Meanwhile, if their conduct differed a way that would be material to an employer, they will not be considered proper comparators. Id.

Plaintiff points to Carly Cruz as a "similarly situated" person at Mercy who fell outside of the protected class but received more favorable treatment after engaging in comparable conduct to Plaintiff. (See Pl. Br. at 22) ("Defendant's disparate treatment of Plaintiff [as compared to Cruz] provides sufficient evidence of Defendant's discriminatory intent."). This argument is unavailing. Cruz was the charge nurse with whom Plaintiff got into an altercation on November 7, 2010. Both women exchanged heated remarks in the Mercy cafeteria, as overheard by at least one witness. (Def. Ex. GG). But as both parties admit, it was only Plaintiff who made a threat of physical violence during the altercation. (See Ballard Dep., Def. Ex. C at 193-194; Mercy Hospital Incident Report, Def. Ex. EE). Moreover, Cruz did not commit a host of additional employment infractions on November 7th, such as changing her assignment without permission or leaving the triage area of the hospital unattended, as had Plaintiff. (See Ballard Dep., Def. Ex. C at 114, 130 & 177; Annette Williams Statement, Def. Ex. CC; Carly Cruz Statement, Def. Ex. DD). Cruz also had not amassed a series of workplace infractions prior to November 7th. (Compare Mercy Counseling Reports, Def. Exs. T – Y (showing admonishments of Plaintiff in 2009 and 2010 for lateness, absences, and failure to follow procedures); with Williams Dep., Def. Ex. L at 88-90 (relating that Cruz had no history of employment infractions prior to November 7, 2010)).

For these reasons, Cruz was not similarly situated to Plaintiff. It is true she received more favorable treatment after the November 7th altercation. Cruz was neither suspended nor fired, but was instead told not to come to work during Mercy's investigation and was subsequently disciplined. (Williams Dep., Def. Ex. L at 63-64; Clift Dep., Def. Ex. HH at 32; Mercy HR Note, Def. Ex. LL; Mercy Counseling Report, Def. Ex. PP). Plaintiff was suspended during the investigation and ultimately terminated. (Williams Dep., Def. Ex. L at 65-66; Clift Dep., Def.

Ex. HH at 47-48; Mercy Counseling Report, Def. Ex. JJ; Mercy HR Note, Def. Ex. LL). But

such differential treatment is insufficient to allow an inference of discrimination, given that

Cruz's conduct both before and on the day in question was significantly less problematic. The

two women were not similarly situated, and so their divergent treatment does not provide

evidence of racial discrimination. See Brokenbaugh v. Exel Logistics N. Am., Inc., 174 Fed

App'x 39, 46 (3d Cir. 2006) ("After reviewing the evidence, we find no evidence of an employee

at Exel that had amassed a record so replete with workplace infractions that he or she might be

considered similarly situated to Brokenbaugh."); Philpot, 2011 WL 5339030, at *6 (concluding

an individual was not similarly situated to the plaintiff because "the disciplinary incidents in [his]

past" were "less serious" and his conduct on the day in question was "not of the same

character").

Besides Cruz, Plaintiff points to no other individual at Mercy Hospital who she alleges

was similarly situated but treated more preferentially. Nor does she present other evidence that

creates an inference of racial discrimination.  The one act of discriminatory conduct that Plaintiff

highlights at Mercy – Carly Cruz's use of the "n" word on November 7th, 2010 – was

perpetrated by a co-worker who had no involvement in the decision to terminate Plaintiff.

Under Third Circuit precedent, this sort of "stray remark" by a non-decisionmaker cannot

on its own support an inference of discriminatory treatment. See Carilli v. Mut. of Omaha Ins.

Co., 67 Fed. App'x 133, 135 (3d Cir. 2003) ("While Carilli presents evidence of numerous 'stray

remarks by non-decision makers' at Mutual of Omaha . . . the evidence Carilli presents fails to

link those remarks to the Violence Committee so as to reasonable support an inference of

discriminatory intent and pretextual termination by that body."); Walden v. Ga.-Pac. Corp., 126

F.3d 506, 521 (3d Cir. 1997) ("We have generally held that comments by those individuals

outside of the decisionmaking chain are stray remarks, which, standing alone, are inadequate to support an inference of discrimination.").[1]

Accordingly, Plaintiff fails to make out a prima facie case of racial discrimination and summary judgment is warranted for Defendant on this claim.

### B. Hostile Work Environment Claim

The Court also enters summary judgment for Defendant on Plaintiff's hostile work environment claim because it finds Plaintiff has again failed to establish a prima facie case.

To present a prima facie case of a hostile work environment, a plaintiff must show, among other things, the existence of "pervasive and regular" discrimination at her workplace. See Aman v. Cort Furniture Rental Corp., 85 F.3d at 1081. In the Third Circuit, this means there must be evidence of "a hostile or abusive environment . . .'severe enough to affect the psychological stability of a minority employee.'" Ocasio, 92 Fed. App'x at 880 (citing Andres v. City of Phila., 895 F.2d 1469, 1482 (3d Cir. 1990)). "Isolated incidents" of harassment will not qualify as "pervasive and regular," id., nor will the "'utterance of an . . . epithet which engenders

---

[1] The Supreme Court's decision in Staub v. Proctor Hospital, 131 S. Ct. 1186, 1189 (2011), does not change this conclusion. In Staub, the Court adopted a "cat's paw" theory of employer liability for discrimination, holding that when a supervisor performs an act motivated by discriminatory animus and when that act is both intended to cause an adverse employment action and *does* proximately cause the adverse employment action, an employer can be held liable even if the ultimate decision-maker did not personally harbor discriminatory intent. Id. at 1193 ("The employer is at fault because one of its agents committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment decision."). At oral argument in June 27, 2013, Plaintiff's counsel urged the Court to adopt a "cat's paw" analysis here, and view Cruz's racial slur not as a "stray remark" with no legal consequence but as a discriminatory action that should be imputed to Defendant.

Staub is not applicable for two reasons. First, unlike the individuals in Staub who performed the conduct motivated by animus vis-à-vis the plaintiff, Cruz was not Plaintiff's supervisor. See id. at 1190, 1193-1194 & n.4 (describing the persons who performed the discriminatory acts as the plaintiff's supervisors and stating "[w]e express no view as to whether the employer would be liable if a co-worker, rather than a supervisor, committed [the] discriminatory act that influenced the ultimate employment decision"). Second, there is no evidence submitted by either party showing that Cruz's reporting of Plaintiff's threat of violence to the police or to hospital security – even if it was an act undertaken with the intent to cause Plaintiff's termination – was a proximate cause of Plaintiff's being fired. Laura Clift and Carmen Williams both related that the ultimate decision to terminate Plaintiff was premised on her series of infractions in the emergency department on November 7th, not on the altercation between Plaintiff and Cruz in the cafeteria. (Williams Dep., Def. Ex. L at 45-52 & 65 -76; Clift Declaration, Def. Ex. H at 48). The HR Report recorded by Clift similarly states: "Determination was made to separate Ballard related to inappropriate behavior exhibited during shifts – such as reassigning self / changing assignment to the triage / using profanity @ RN station." (Mercy Counseling Rep., Def. Ex. JJ).

offensive feelings in an employee.'" <u>Lawrence v. F.C. Kerbeck & Sons</u>, 134 Fed. App'x 570, 572 (2005) (citing <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 787 (1998)). Other circuits impose similarly demanding requirements for presenting a prima facie case of a hostile environment. <u>See</u> <u>Schwapp v. Town of Avon</u>, 118 F.3d 106, 110-11 (2d Cir. 1997) ("For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." (internal citations and quotation marks omitted)).

Plaintiff's evidence, at best, establishes one incident of racial harassment that transpired at Mercy. Namely, Plaintiff's factual submissions demonstrate that on November 7, 2010, Carly Cruz addressed Plaintiff by the "n" word in the Mercy cafeteria. (Ballard Dep., Def. Ex. C at 182-85). There is no evidence that Plaintiff was referred to by a derogatory term on any additional occasion at Mercy, or that other employees complained of such occurrences. As a matter of law, one incident of a racial slur being used in the workplace by a co-worked is insufficient to demonstrate pervasive and regular discrimination, as is required to make out a prima facie case of a hostile environment. <u>See</u> <u>Lawrence</u>, 134 Fed. App'x at 572 ("Although [the supervisor's] alleged comment was disrespectful and inexcusable, we agree with the District court that Lawrence cannot show a hostile work environment based on this one isolated incident."); <u>Ocasio</u>, 92 Fed. App'x at 880 (affirming the district court's judgment that "[t]here is insufficient evidence that these few alleged incidents [of harassment] created a hostile work environment"); <u>Jones v. Norton</u>, 2008 WL 282251, at *3 (E.D. Pa. Jan. 31, 2008) (holding "evidence of a single, racially charged, highly inappropriate outburst by a fellow employee"

simple did not "rise to the level of intentional racial discrimination required to make out a hostile work environment claim").

At oral argument, Plaintiff's counsel could not cite any other evidence of discrimination against Plaintiff on account of her race. Plaintiff asserts that her suspension was undertaken in retaliation for her complaint of Ms. Cruz's use of the "n" word, but as is discussed in the next section, the factual record is undisputed that Plaintiff's supervisors, Ms. Williams and Laura Clift, ordered the suspension before they had any knowledge of Plaintiff's complaint. (See Williams Dep., Def. Ex. L at 37-39, 43-47 (stating the first time she became aware of Plaintiff's allegation was at the suspension meeting, prior to which she and Clift decided to suspend Ballard); Ballard Dep., Def. Ex. C at 234-249 (stating the first time she informed Williams of the "n" remark incident was at the suspension meeting); Clift Dep., Def. Ex. HH at 28-32 (relating "Carmen and I both met with Nicole Ballard after the decision had been made that she would be placed on leave").

Accordingly, the Court finds summary judgment for Mercy is warranted on Plaintiff's hostile environment claim. See Ahmed v. Lowe's Co. Inc., 2008 WL 2967061, at *7 (E.D. Pa. July 31, 2008) (Baylson, J.) (granting summary judgment to defendant because the plaintiff "failed to provide adequate evidence" that would "allow a reasonable factfinder to adduce that Plaintiff was forced to work in a hostile environment").

## C. Retaliation Claim

Finally, the Court grants summary judgment to Mercy on Plaintiff's retaliation claim. The Court finds that while Plaintiff has satisfied her burden in making out a prima facie case, her evidence is not sufficient to permit a reasonable factfinder to conclude Mercy's business-related explanation is pretextual.

### 1. Plaintiff's Prima Facie Case

To establish a prima facie case of retaliation under Section 1981, a plaintiff must show she engaged in a protected activity, suffered an adverse employment action, and that there was a causal connection between her protected activity and the action taken against her. Moore, 461 F.3d at 340-41. Mercy assumes for the purpose of summary judgment that Plaintiff has prevailed on the first two prongs of the test, but it contends she has not submitted evidence sufficient to demonstrate causation. See Def. Br. at 30 n. 20 (ECF 22); Def. Reply Br. at 4 n.6 (ECF 24).

The Court concludes Plaintiff has, in fact, satisfied her burden of demonstrating a prima facie case of retaliation. Plaintiff's deposition testimony and a physical print-out from the "MIDAS" system both show that when she arrived for work on the morning of November 8th, 2010, Plaintiff submitted an internal complaint of racial harassment. (See Ballard Dep., Pl. Ex. A at 206; MIDAS Report, Pl. Ex. J at 1 (containing an entry by Ballard at 8:18 a.m. stating that Cruz "approached" her and "called [her] a derogatory name")). There is also record evidence that Plaintiff reiterated her grievance through submitting a written statement to Williams and Clift on the morning of November 8th, during a meeting in the HR office. (Pl. Ex. I) (stating Cruz called her a "lying n_ _ _ _ _"). The filing of these reports qualifies as a protected activity under Title VII and Section 1981. See Moore v. City of Phila., 461 F.3d 331, 343 (3d Cir. 2006) (holding informal protests of discriminatory conduct at the workplace, "including making complaints to management," qualify as protected activities). Meanwhile, Plaintiff was suspended on the same day she submitted her complaints, and was permanently fired two days later. (Ballard Dep., Pl. Ex. A at 239; Termination Notice, Pl. Ex. N). In the Third Circuit, this sort of close temporal connection, between a plaintiff's protected activity and the adverse action against

her, suffices to show causation at the prima facie stage. See Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 307 (3d Cir. 2012) (holding while there is "no bright line rule as to what constitutes unduly suggestive temporal proximity," the passage of seven days between the plaintiff's invocation of her rights and her termination satisfied the causation prong of the prima facie case) (internal quotation marks omitted); Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 188-89 (3d Cir. 2003) (holding the passage of ten days between the protected activity and the adverse action is sufficient to establish a prima facie case of retaliation).

## 2. Defendant's Non-Discriminatory Explanation

Given that Plaintiff has presented a prima facie case of unlawful retaliation, the burden of production shifts to Mercy to advance a legitimate, non-retaliatory explanation for its action. The Court finds Mercy has presented such an explanation.

As to the suspension decision, Mercy claims it acted pursuant to a hospital policy requiring any employee alleged to have made a physical threat of violence to be suspended, pending an investigation. (Williams Dep., Def. Ex. L at 35; Clift Dep., Def. Ex. HH at 29). William stated in her deposition that she received a phone call on the evening of November 7th informing her of Ballard's threatening to punch Cruz in the cafeteria. (Williams Dep., Def. Ex. L at 34-36, 42-43; see also Ballard Dep., Def. Ex. C at 231-32 (relating that when Plaintiff went to speak with Williams "around eightish or nine-ish" on November 8th, Williams already heard about the altercation)). The next morning, Williams and Human Resources' Laura Clift spoke and decided that Plaintiff should be suspended, according to the hospital's policy. (Williams Dep., Def. Ex. L at 42-43; Clift Dep., Def. Ex. HH at 27-30). This stands as a valid, business-related reason for Plaintiff's suspension.

As to the termination decision, Mercy claims it fired Plaintiff both because she violated hospital rules on November 7th and also because she had accumulated a history of workplace infractions prior to that date. (Def. Br. at 20-21). Mercy again presents evidence supporting its claim. It submits reports of hospital employees filed with Williams and Clift on November 9th and 10th, stating that Plaintiff had acted irresponsibly and unprofessionally on November 7th when she unilaterally changed her assigned station, left the triage area of the ER unattended, and used profane language vis-à-vis other nurses. (Def. Ex. AA, CC, DD & KK). These infractions ran afoul of Mercy's Colleague Responsibility Policy (see Def. Ex. G at 2), and they resulted in Williams and Clift's decision to terminate. (Williams Dep., Def. Ex. L at 51. 66-68; Clift Dep., Def. Ex. HH at 47-49). Meanwhile, Mercy also shows Plaintiff had accumulated a history of tardiness, absences, and failures to follow hospital protocol between February 2009 and March 2010 (Williams Dep., Def. Ex. L. at 71-73; Def. Exs. T, U, V, W & X), and that this record influenced Williams' termination decision. (Williams Dep., Def. Ex. L at 70-74).

### 3. Plaintiff's Failure to Show Pretext

Accordingly, the burden shifts to Plaintiff to prove pretext. While Plaintiff alleges Mercy's proffered explanations for her suspension and termination are mere excuses for retaliatory animus, the Court finds Plaintiff's evidence insufficient to substantiate such a claim.

To prove pretext, an employee must demonstrate that "retaliatory animus played a role in the employer's decisionmaking process and that it had a determinative effect on the outcome of that process." Shellenberger, 318 F.3d at 190 (citing Krouse v. Am. Sterilizer Co., 126 F.3d 494, 501 (3d Cir. 1997)). As explained above, a plaintiff can make such a demonstration by "point[ing] to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reason; or (2) believe that an invidious

reason was more likely than not a . . . determinative cause of the employer's action." Fuentes, 32 F.3d at 764; Calero v. Cardone Indus., Inc., 2012 WL 2547356, at *11 (E.D. Pa. June 29, 2012) (Baylson, J.) (using the Fuentes standard to guide the court's pretext analysis for a retaliation claim).

The Court concludes Plaintiff has not demonstrated pretext through either of the two avenues provided for in Fuentes. As to evidence that could permit a reasonable factfinder to disbelieve Mercy's "legitimate reason" for its action, Plaintiff attempts to show Mercy has offered inconsistent, "ever-changing" explanations for its decision to fire her.  (See Pl. Br. at 12-13).  Demonstrating inconsistency in an employer's stated justification for its action is, indeed, a way of proving pretext.  Abramson v. Williams Paterson Coll., 260 F.3d 265, 284 (3d Cir. 2001). However, all of the record evidence shows that Mercy has *consistently* pointed to Plaintiff's violations of the Colleague Responsibility Policy, through her use of profanity, unilateral changing of her assignment, and abandonment of the triage area, coupled with her history of tardiness and other misconduct, as the reason for her termination. (See Ballard Dep., Def. Ex. C. at 242-51 (recalling Plaintiff was handed a copy of Mercy's "policy" at her termination meeting and was told she was being fired for violating it, as well as for other problems such as her attendance record); Termination Letter, Def. Ex. QQ (stating the basis for Plaintiff's termination was her "violation of Mercy Health System Policy #60-18-5, Colleague Responsibility"); Def. Ex. O (explaining, in its filings with the EEOC,  that Plaintiff was fired for violating the hospital's Colleague Responsibility Policy when she called her co-workers "bitches" and unilaterally changed her patient care assignment); Williams Dep., Def. Ex. L at 51-52 (stating Plaintiff was fired for "plac[ing] herself in the triage area," leaving "the triage area unattended without notifying the charge nurse," stating "she wasn't working with these bitches back here,"

and also relating "Ms. Ballard was not a stellar employee[] for two and a half years"). Plaintiff's allegation of inconsistency by Mercy rings hollow.

Plaintiff also attempts to provide a basis for disbelieving Mercy's proffered explanation by showing she did not actually violate any hospital policies on November 7th. Again, Plaintiff is correct that offering such evidence, were it to contradict "the core facts put forward" by Mercy to justify its conduct, would enable her to show pretext. See Kautz v. Met-Pro Corp., 412 F.3d 463, 476 (3d Cir. 2005). But Plaintiff's only evidence contradicting "the core facts put forward" by Mercy are her own, unsupported statements. In her Brief opposing summary judgment, Plaintiff contends her conduct on November 7th did not violate Mercy's protocols because using the term "bitches" was "a common occurrence amongst nurses in the emergency department," because "there was no formal procedure in which nurses were designated patient care assignments," and because leaving the triage area of the ER unattended for a "split second" would have been an "implausible" reason to fire anyone. (Pl. Response in Opp. Summary Judgment at 14-18). In support of these contentions, Plaintiff offers her deposition testimony alone. She submits no external evidence – such as deposition testimony by other individuals at Mercy, internal documents, or records from human resources – to support her claims. She has thus failed to create a genuine dispute of fact as to whether Mercy's explanation for her termination should be discredited. See Jones v. Sch. Dist. of Phila., 198 F.3d 403, 414 (3d Cir. 1999) (holding that plaintiff "makes numerous allegations in his affidavit which he predicates on nothing more than his beliefs" and that such could not enable a jury to conclude "the school district's purported reasons for its adverse employment actions were a pretext for discrimination").

Finally, Plaintiff endeavors to prove pretext by pointing to the temporal link between her internal complaint and her suspension and termination, arguing the close timing of these events stands as conclusive proof of Mercy's retaliatory animus. While this temporal proximity might have sufficed to show causation for the purposes of the prima facie case, it does not suffice to show pretext at the final stage of the <u>McDonnell-Douglas</u> burden-shifting test.

While there was a temporal link between Plaintiff's protected conduct and her suspension, Williams and Clift both testified they only learned of Plaintiff's harassment complaint after they had already decided to suspend her for threatening Cruz. (<u>See</u> Clift Dep., Def. Ex. HH at 28-32 (relating "Carmen and I both met with Nicole Ballard after the decision had been made that she would be placed on leave" and Clift learned of Plaintiff's charge of harassment at the suspension meeting); Williams Dep., Def. Ex. L at 37-39, 43-47 (stating the first time she became aware of Plaintiff's allegation was at the suspension meeting, prior to which she and Clift decided to suspend Ballard "because of the threat")). Plaintiff offers no evidence of actual knowledge by Williams or Cruz of Plaintiff's protected activity, at the time they decided to suspend her. (<u>See</u> Ballard Dep., Def. Ex. C at 272) (admitting she had "no clue" how quickly MIDAS reports were read). Merely pointing to a temporal link without showing the decisionmakers were aware of a plaintiff's protected conduct is not sufficient to demonstrate retaliatory animus. <u>See Ogilvie v. N. Valley EMS, Inc</u>., 2008 WL 4761717, at *12-13 (E.D. Pa. 2008) (Baylson, J.) (holding "timing on its own [did] not create an inference of a causal link [of retaliation]" because the plaintiff failed to show the employer was aware of his protected activity); <u>Embrico v. U.S. Steel Corp</u>., 404 F. Supp. 2d 802, 838 (E.D. Pa. 2005) (finding plaintiff failed to establish causation because she had not shown those who made the adverse employment decision had knowledge of the protected activity).

Additionally, while there was temporal proximity between Plaintiff's protected activity and her termination, Mercy's evidence demonstrates there was no causal relationship. Rather, according to Williams and Cruz's deposition testimony, Plaintiff was fired because the investigation yielded numerous reports of Plaintiff's incidents of misconduct in the emergency department on November 7th. (See Williams Dep., Def. Ex. L at 45-52 & 65 -76; Clift Declaration, Def. Ex. H at 48; see also Def. Exs. AA, BB, CC, DD & KK (employee reports of Plaintiff's misconduct)). The HR Report accompanying Plaintiff's termination supports this account. (See Mercy Counseling Rep., Def. Ex. JJ) ("Determination was made to separate Ballard related to inappropriate behavior exhibited during shifts – such as reassigning self / changing assignment to the triage / using profanity @ RN station."). Plaintiff submits no evidence suggesting it was in fact her harassment complaint, rather than her misconduct, which drove Mercy's action. For instance, she points to no pattern of retaliation against employees at Mercy who expressed their rights, and to no evidence that Mercy was satisfied with her performance and would not have fired her without an illegitimate motive. Thus, Plaintiff has not provided a reasonable factfinder a basis on which to conclude retaliatory animus played any part in Mercy's termination decision. See Calero, 2012 WL 2547356 at *14 (holding the plaintiff failed to "provide sufficient evidence of discriminatory intent to allow a factfinder to conclude that [the] discharging of [plaintiff] was based on anything other than legitimate company policy"); Klina v. Se. Pa. Transp. Auth., 2011 WL 4572064, at *11-12 (E.D. Pa. Oct. 3, 2011) (Baylson, J.) (explaining that while evidence of "satisfactory" performance by the employee or of "long-standing discriminatory practices" could demonstrate pretext, the plaintiff had not adequately shown either). Summary judgment for Mercy is warranted.

## V.       Conclusion

For the forgoing reasons, Defendant's Motion for Summary Judgment (ECF 22) is

**GRANTED**.

An appropriate Order follows.

O:\SARA\BALLARD V MERCY HOSPITAL\MEMORANDUM RE MOTION FOR SJ-1.DOCX